IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JUNE 1999 SESSION

FILED

September 20, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| DONALD WAYNE HOLT, | ) | |
| | ) | No. 01C01-9805-CC-00201 |
| Appellant, | ) | |
| | ) | Rutherford County |
| v. | ) | |
| | ) | Hon. James K. Clayton, Jr., Judge |
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee. | ) | (Post-Conviction) |

For the Appellant:

W.H. Stephenson II
311 White Bridge Road
Nashville, TN  37209

For the Appellee:

Paul G. Summers
Attorney General and Reporter
        and
Marvin E. Clements, Jr.
Assistant Attorney General
Cordell Hull Building, 2nd Floor
425 Fifth Avenue North
Nashville, TN  37243-0493

William C. Whitesell, Jr.
District Attorney General
303 Rutherford Co. Judicial Bldg.
Murfreesboro, TN  37130

OPINION FILED: _____

AFFIRMED

Joseph M. Tipton,
Judge

## OPINION

The petitioner appeals as of right from the order of the Rutherford County Circuit Court denying him post-conviction relief from his 1991 conviction for aggravated rape and his resulting twenty-two year sentence. This court affirmed the conviction on direct appeal. See State v. Donald Wayne Holt, No. 01C01-9503-CC-00053, Rutherford County (Tenn. Crim. App. Sept. 27, 1995). The petitioner contends that the trial court erred in determining that he received the effective assistance of counsel at his trial. Upon a complete review of the record, we affirm the judgment of the trial court.

## PROCEDURAL HISTORY

A Rutherford County jury convicted the petitioner of aggravated rape. This court set forth the following statement of the facts on direct appeal:

> On July 11, 1990, the victim became 21 years of age. After her date for the evening did not show up, she left home and consumed a considerable amount of liquor. Around midnight, the victim stopped at the Kroger parking lot in Smyrna, Tennessee to use the telephone. She planned to call her brother because she was too intoxicated to drive. The appellant and two of his acquaintances were at the parking lot. The appellant walked over and introduced himself to the victim. After conversing for about twenty minutes, the appellant persuaded the victim to allow him to drive her home.
>
> After leaving the parking lot, the victim passed out and awoke when the appellant was stopped by the police for speeding. At that point, they were in LaVergne, Tennessee. The appellant and the victim followed the police to the police station. When the appellant went into the station, the victim attempted to drive her vehicle away, but one of the [policemen] prevented her from doing so because of her intoxication. The victim passed out again and woke up when the appellant came back to the car. The victim again asked the appellant to carry her home, but, instead, the appellant drove to a secluded area.
>
> After stopping, the appellant removed the victim's pants, and forced her to have oral sex, vaginal sex, anal sex, and oral sex again. During this time, the victim screamed and attempted to push the appellant away, but she could not get up. After the appellant made the victim engage in oral sex the second time, she pretended she was vomiting and then acted as if she could not breathe. This alarmed the appellant, and, consequently, they left to seek medical treatment.

The appellant and the victim stopped at a convenience store, and the victim requested the attendant call an ambulance.[1] The appellant then came into the store, and the victim began kicking her feet and throwing her hands at him. He was told to leave by the attendant. The victim told the attendant that she had been raped. The attendant called 911 which called the police and an ambulance.

Dr. Sharon Piper, a medical doctor specializing in obstetrics and gynecology, testified as an expert witness. Dr. Piper treated the victim at the Vanderbilt hospital and assisted in surgery. The victim sustained painful injuries to her vagina, rectum, and perineum. Over the objection of the appellant, Dr. Piper gave the following testimony:

"Q. Doctor, again, do you have a medical opinion as to what caused this type of injury?

A. Well, her external exam had revealed the possibility of forced intercourse. We weren't quite sure about the internal injury. The thought did cross my mind, was a blunt instrument used.

Q. Could the injury that you observed, the laceration inside the vagina based upon a reasonable degree of medical certainty, could that have been caused by the fact that the vagina did not expand and did not lubricate?

A. Yes, sir. . .

Q. Now, back to the question I started to ask, do you have an opinion based upon a reasonable medical certainty, based upon the injuries that you observed as to whether this intercourse was forced or not forced intercourse?

A. Due to the extent of her injuries, I do not feel that this can be voluntary."

The appellant's defense was that the victim consented to sex.

The appellant testified that he saw the victim at the Kroger parking lot at approximately midnight. He found her attractive and engaged her in conversation. After talking for about twenty minutes, the victim gave the appellant the keys to her car. The victim told him it was her birthday, and she wanted to party. They went to LaVergne because a convenience store there sold beer until 3:00 a.m. He was stopped by police for speeding but gave the officers his brother's name because he did not have a license. After leaving the police station, the victim said she wanted to go home, but then said she did not because she would get into trouble. While driving down the road, the victim grabbed the appellant by the neck, kissed him, and told him he was cute. The appellant suggested they go

---

[1]A reading of the original trial transcript shows that petitioner, not the victim, requested that the clerk call for help.

> parking and have sex to which the victim agreed. According to [petitioner], the victim willingly engaged in the sexual activities which she had earlier described, and she enjoyed the sexual acts. After the victim became ill, they left to seek medical treatment.
>
> The appellant attempted to corroborate his claim of consent by testimony that he was struck by lightning a few days before the incident, and this injury incapacitated him to a degree that he could not physically force the victim to have sex.

Donald Wayne Holt, slip. op. at 2-5. Additional information was included in footnotes one and two of the opinion:

> 1. The victim is five foot two inches tall and weighs 88 pounds. She testified that she had not previously engaged in sex, and her testimony was corroborated by Dr. Sharon Piper. The victim had a number of medical conditions including a common variable hypogammaglobulinenia, a blood disorder, severe bronchiectasis, a condition of the lungs, and a nutritional condition which required a porta-cath (a permanent IV) in her chest.
>
> 2. Dr. Piper testified to these specific injuries. There was a one centimeter tear on the right lateral aspect of the urinary opening. There were multiple abrasions on the labia. There was a one centimeter perennial tear. The entire perennial area was undergoing the initial stages of severe bruising. The victim had partial rectal prolapse. Her rectum was actually coming outside of her body. The anal area was very swollen and the muscle tone was gone. The victim had a five centimeter laceration in her vagina. These injuries necessitated extensive surgery and the victim was hospitalized at Vanderbilt from July 12, 1990 to July 21, 1990. The total medical bills were in excess of $ 19,000.00.

Id. at 3.

In his direct appeal, the petitioner challenged the sufficiency of the evidence, the admission of Dr. Sharon Piper's testimony that the victim's injuries were caused by force, the exclusion of David Meador's testimony regarding the victim's prior inconsistent statement, and the sentence. This court affirmed the judgment of the trial court.

## CONTENTS OF THE PETITIONER

The petition for post-conviction relief alleges ineffective assistance of counsel and cites the following errors by trial counsel:[2]

1. failure to investigate the case sufficiently;

2. failure to present a defense within the required range of competence;

3. failure to cross-examine the state's witnesses properly;

4. failure to prepare adequately for trial;

5. failure to review the petitioner's preliminary hearing before trial;

6. failure to advise and prepare the petitioner sufficiently regarding his testimony;

7. failure to advise the petitioner properly of the evidence against him;

8. failure to contest a fatally defective indictment;

9. failure to advise the petitioner of medical evidence to be presented by the state until immediately before trial, denying him the opportunity to prepare for this testimony;

10. failure to cross-examine the victim properly in order to present testimony by David Meador of the victim's prior inconsistent statement;

11. failure to make an offer of proof to preserve David Meador's testimony for the appellate process;

12. failure to object to damaging testimony by state's witness Dr. Elizabeth LaRoche; and

13. failure to present evidence concerning scientific laboratory results.

## POST-CONVICTION HEARING

The post-conviction court heard testimony from the petitioner, the petitioner's trial attorney, and David Meador, an ambulance attendant.

---

[2]We have consolidated duplicate claims set out by the petitioner.

## A. Testimony of Petitioner

The petitioner testified at the post-conviction evidentiary hearing that when he first met his trial attorney, who was an assistant public defender, in early August 1990, he suffered from a disability to his right arm, the result of a lightning strike he received in July just before the alleged rape. The medication that the petitioner took for the disability affected his reaction time and his strength, but he was unsure whether counsel was aware of this fact.

The petitioner testified that his attorney neither showed him the indictment nor apprised him of the elements and culpable mental state for aggravated rape. He also said that she never reviewed the preliminary hearing transcript or any discovery materials with him. The petitioner said he was unaware of the victim's rape kit results and the extent of her injuries until trial. He said his attorney never reviewed the victim's medical records with him. He said she did interview three witnesses named by the petitioner, as well as Officer Ruch and the petitioner's physician. However, the petitioner stated she did not share the substance of those conversations with him.

The petitioner did not recall being told of any plea offer from the state, although he acknowledged that because he maintained his innocence, no real discussion about a plea occurred. He also acknowledged a desire to tell the jury "[his] side of the story." The initial decision for the petitioner to testify at trial was made about one week before the trial. The attorney conducted a practice session in which she briefly questioned the petitioner. Nevertheless, petitioner stated that he was not prepared for the district attorney's cross-examination which resulted in damaging testimony.

In spite of the above, the petitioner said he was not surprised by the evidence at trial and expected a not guilty verdict. He said his attorney told him they had a "pretty good case," and he said he thought he would be acquitted. The petitioner claimed that

when the victim said "don't stop," he took that to mean she did not want him to stop, and so he continued. He maintained his innocence and claimed that the intercourse began consensually, that he did not mean to hurt the victim, and that he just made a mistake.

### B. Testimony of David Meador

David Meador testified at the post-conviction evidentiary hearing that on the night of the aggravated rape, he worked for Rutherford County Emergency Medical Services. Meador said he assisted the victim, who gave a statement about what happened. Meador read the following pertinent portion of his report into the record:

> ". . . during intercourse she became afraid he was going to hurt her ---afraid he was going to hurt her because he kept putting his hand over her mouth and telling her to shut up. He was also telling her to shut up prior to the intercourse."

Meador did not remember the victim either expressing that she felt fear prior to the start of intercourse or saying anything about rape, nor did she say that the intercourse was consensual. Meador said he met with the petitioner's attorney before the trial. Although unable to remember exactly what he told her at that time, he speculated that they reviewed and discussed the contents of his report.

### C. Testimony of Trial Attorney

The petitioner's attorney conducted an initial interview with the petitioner which lasted thirty minutes to one hour. She said she heard the petitioner's version of the events and discussed the charges against him. She said the petitioner cooperated in the preparation of his case, although he was arrested several times between her appointment and the start of trial.

The attorney said she spoke with the convenience store clerk within four days of her original appointment. She said she participated in the preliminary hearing on August 10, 1990. She stated that she later received information about another possible

7

witness and tried to get information from the petitioner's doctor regarding the petitioner's injury and his inability to force someone to have sex with him.

The attorney testified that in the course of her pre-trial investigation, she secured a preliminary hearing transcript to use in preparing for her cross-examination of the victim. She said she also went to the scene of the crime. Her case log reflects that the petitioner appeared at his arraignment, which confirmed to her that he knew the charges against him. She said that a copy of the indictment would have been made available to the petitioner at that time.

The attorney said she interviewed LaVergne police officers Spicer and Ruch about their involvement with the petitioner on the night of the rape. She said she also contacted several people mentioned by the petitioner as witnesses to the lightning strike and injury he suffered just days before the rape.

The attorney testified that the petitioner visited her office regularly. Although not every meeting was an interview, she said she did advise him about the aggravated rape charge. Before the preliminary hearing, she said she explained the charge, and she testified that she would have explained the elements of the crime. She said that she explained the defense of consent and that the petitioner seemed to understand their discussions.

The attorney said she discussed the option of a plea agreement with the petitioner, but the petitioner resisted and maintained that he did not rape the victim. Although her case log reflected an offer to allow the petitioner to plead guilty to simple rape, she said she did not recall receiving or discussing any specific plea offer with the petitioner. However, she stated that the office policy was to convey any and all

8

settlement offers and that there was no reason to believe that the policy was not followed in this case.

The attorney testified that she reviewed the victim's medical records prior to trial. Because she understood them, she said she felt no need to consult a medical expert or medical library for clarification of their import. She said the records revealed substantial injuries to the victim. The attorney did not remember reviewing the medical records with the petitioner but did advise him of the serious nature of the victim's injuries.

The attorney testified that the state did comply with the court's discovery order, although it was still providing discovery four days before trial. The attorney said she reviewed the state's file pursuant to its open-file policy. She said the state informed her shortly before trial that Dr. Sharon Piper would be a witness. She said she interviewed Dr. Piper the next day, and Dr. Piper expressed her medical opinion that the victim's injuries were not the result of consensual sex. The attorney said she did not seek another medical professional to assess the opinion, nor did she pursue other possible causes of the victim's injuries.

The attorney also recalled that Officer Ruch testified favorably for the petitioner at trial. She said he testified that the victim told him that the petitioner did not force her into the kissing and oral intercourse. She said this corroborated the petitioner's version that the sexual intercourse was consensual.

The attorney said that Dr. Piper testified that in her medical opinion, the victim's injuries could only have been caused by force. The attorney said she did not cross-examine Dr. Piper regarding this aspect of her testimony because the petitioner did not contest the existence of the victim's injuries. She said that Dr. Elizabeth LaRoche testified in rebuttal for the state that a speculum could not cause the injuries suffered by

9

the victim. The attorney said she did not object to the testimony and chose not to cross-examine Dr. LaRoche. She said that she did not want to risk Dr. LaRoche testifying that the petitioner could have caused the injuries.

The attorney said that she and the petitioner discussed his decision to take the stand at trial. She said that in preparation, they rehearsed his testimony with her playing the role of prosecutor. She also related that a week before trial, the District Public Defender, Gerald Melton, put the petitioner through a "grueling" cross-examination.

The attorney testified that the petitioner made the final decision to testify during the trial. She said that the victim's testimony was very sympathetic and effective and that she felt the jury wanted to hear from the petitioner. She said the petitioner had done well in rehearsal, and she hoped he would come across well to the jury. She said she did not discourage the petitioner from testifying, but the choice ultimately remained the petitioner's to make.

According to the attorney, the petitioner had three defenses available to him: alibi, consent, and mistake. She said that alibi was not an option under the facts of this case. Although she said she felt that mistake can be a legitimate defense, she said she was unaware of any case in which it was used successfully. She said she decided not to assert it and did not request a jury instruction. Instead, she said she asserted the defense of consent.

Based on her pre-trial meeting with David Meador, the attorney believed that Meador felt the intercourse between the petitioner and the victim was consensual. She said the district attorney successfully objected to Meador's testimony about the victim's statement based upon the requirement that a witness first be given an opportunity to

10

explain a prior inconsistent statement. She said she made a conscious decision not to cross-examine the victim regarding her alleged statement to Meador that the intercourse was consensual. She said the state rule regarding impeachment by use of a prior inconsistent statement was in question, and the federal rule would have required the state to recall the victim to explain her statement. She admitted that she did not make an offer of proof.

Nevertheless, the attorney said she was prepared for trial. She said she presented the defense of consent as planned. She also felt that the petitioner was prepared to go to trial and to assist in his defense. She said there were no real surprises regarding the evidence presented other than the judge's evidentiary ruling against her with regard to Meador's testimony. The attorney felt that, overall, she effectively represented the petitioner.

## TRIAL COURT'S FINDINGS

The trial court found that the attorney rendered competent, effective representation. In response to the petitioner's claim that the case was insufficiently investigated, the court found otherwise. The court found that the attorney and members of the public defender's office had numerous meetings with the petitioner during which the case was discussed to everyone's apparent satisfaction. It found that the attorney reviewed the medical evidence against the petitioner and that she did a good job cross-examining the state's witnesses. The trial court noted that this case was essentially a credibility contest between the petitioner and the victim. The jury chose to believe the victim. The trial court concluded that the attorney presented a defense within the required range of competence.

## STANDARD OF REVIEW

In a post-conviction case, the burden is on the petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 369-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied, as well, to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (counsel's conduct will not be measured by "20-20 hindsight"). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.

Also, we note that the approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

On appeal, we are bound by the trial court's findings unless we conclude that the evidence preponderates against those findings. In this respect, we may not reweigh or reevaluate the evidence or substitute our inferences for those drawn by the trial court. See Henley v. State, 960 S.W.2d 572, 578-79 (1997); Black, 794 S.W.2d at 755. Questions concerning the credibility of witnesses and the weight and value to be given to their testimony are resolved by the trial court. Henley, 960 S.W.2d at 579; Black, 794 S.W.2d at 755. The petitioner has the burden on appeal of illustrating how the evidence preponderates against the judgment entered. Id.

**ANALYSIS**

1.      As for the alleged failure to investigate the case sufficiently, the trial court found that the attorney adequately investigated the case. The evidence does not preponderate against this finding. Furthermore, the petitioner has failed to establish that further investigation would have benefited his defense. The petitioner has not shown deficiency or prejudice.

2.      As for the alleged failure to present a defense within the required range of competence, the trial court specifically found that the defense was competent. The record does not preponderate against this finding. The attorney's failure to present the defense of mistake was a tactical decision which this court may not second-guess. The petitioner has not shown deficiency.

13

3.      As for the alleged failure to cross-examine the state's witnesses properly, the trial court specifically found that the attorney did a good job in her cross-examination.  The record does not preponderate against this finding.  The petitioner has not shown deficiency.

4.      As for the alleged failure to prepare adequately for trial, the attorney's case log reflects ample preparation.  The petitioner has demonstrated neither any deficiency on her part nor that additional preparation would have resulted in a different outcome.  The petitioner has failed to show prejudice.

5.      As for the alleged failure to review the petitioner's preliminary hearing testimony prior to trial, the attorney testified that she had a transcript made from which to prepare for the victim's cross-examination.  The petitioner has failed to prove that his attorney did not review the transcript, nor does the petitioner establish that this would have affected the trial's outcome.  The petitioner has not made a showing of deficiency or prejudice.

6.      As for the alleged failure to advise and prepare the petitioner sufficiently for his testimony at trial, the attorney testified that they discussed this issue.  She testified that they rehearsed the petitioner's testimony and that the petitioner made the final choice during the trial to testify.  The petitioner has failed to show any deficiency by counsel or prejudice.

7.      As for the alleged failure to advise petitioner adequately of the evidence against him, the attorney testified that the petitioner was advised of, and understood, the evidence against him. The petitioner has failed to prove otherwise or to show deficiency or prejudice.

14

8.      As for the failure to contest the allegedly "fatally defective" indictment, the petitioner makes no reference to the record and fails to cite any authority. This issue is waived. T.R.A.P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). We also note that this issue has been previously determined against the petitioner in a prior habeas corpus appeal. See Donald Wayne Holt v. Howard Carlton & State, No. 03C01-9702-CR-00059, Johnson County (Tenn. Crim. App. Dec. 23, 1997).

9.      As for the alleged failure to advise the petitioner in a timely manner of medical evidence to be presented at trial, trial counsel testified otherwise. Further, the petitioner has failed to show that any benefit could have been derived from additional preparation or that the outcome would have been different. The petitioner has failed to show deficiency or prejudice.

10.     As for the failure to cross-examine the victim concerning her alleged statement to David Meador, we again see no deficiency. At the time of the trial, no case law existed that interpreted whether Rule 613(b), Tenn. R. Evid., required that the witness be given the opportunity to admit, explain or deny a prior inconsistent statement as a prerequisite to proving the inconsistent statement by extrinsic evidence. We note that the identical Rule 613(b), Fed. R. Evid., was contemplated to do away with the traditional foundation requirement of confronting the impeached witness with the prior inconsistent statement during cross-examination. See Notes of Advisory Committee on Proposed Rules, Fed. R. Evid. 613. In fact, in 1996, this court concluded that it was unnecessary to confront the witness with a statement before the statement was declared admissible. See State v. Henry Lee Martin, No. 01C01-9411-CR-00397, Davidson County (Tenn. Crim. App. May 24, 1996). However, the Tennessee Supreme Court refused to adopt this court's position, holding that extrinsic evidence of an inconsistent statement is inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement. State v. Martin, 964 S.W.2d 564, 567

15

(Tenn. 1998). Defense counsel's actions cannot be evaluated from hindsight but must be evaluated from counsel's perspective at the time of the conduct. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. The attorney's reliance upon most federal courts' interpretation of the same language as found in Rule 613(b), Tenn. R. Evid., was reasonable under the circumstances. We conclude that the attorney's performance was not deficient.

In any event, we note that Officer Ruch's testimony regarding the victim's statements to him also impeached the victim's testimony. Ironically, although the state objected to Officer Ruch testifying about the victim's statement because the defendant had not cross-examined the victim about the statement, the trial court admitted the evidence. Thus, the petitioner did get the benefit of impeaching evidence on the consent issue.

11. As for the failure of counsel to make an offer of proof to preserve David Meador's testimony, the petitioner has not shown that the offer of proof would have affected the outcome of the direct appeal. On direct appeal, this court decided this issue on its merits and simply noted the lack of an offer of proof as an alternative basis. See Donald Wayne Holt, slip. op. at 8.

12. The failure to object to the testimony of Dr. Elizabeth LaRoche was a tactical decision. We may not second guess this decision. The petitioner has not shown deficiency or prejudice.

13. As for the failure to present evidence concerning scientific laboratory results, the petitioner makes no reference to the record and fails to cite any authority. This issue is waived. T.R.A.P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Furthermore, the petitioner has failed to show prejudice.

16

The trial court's findings of fact are conclusive unless the evidence preponderates otherwise. The evidence does not preponderate against the findings of the trial court. We, therefore, conclude that the petitioner has failed to establish the ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
Joseph M. Tipton, Judge

**CONCUR:**

_____
Joe G. Riley, Judge

_____
Alan E. Glenn, Judge